**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Malaika Washington, et al., | No. CV-21-01318-PHX-MTL |
| Plaintiffs, | **ORDER** |
| v. | |
| Freedom of Expression LLC, et al., | |
| Defendants. | |

Plaintiffs are a group of twenty-two former dancers of Bones Cabaret and Skin Cabaret (collectively "Defendants") who allege minimum wage violations under the Fair Labor Standards Act ("FLSA").[1] Plaintiffs and Defendants have each filed motions for summary judgment (Docs. 222, 230) and motions to strike (Docs. 228, 232.) The Motions are fully briefed. (Docs. 222, 227, 228, 230, 231, 232, 236.) All four Motions are denied.[2]

**I.   BACKGROUND**

Defendants did not require their dancers to have any formal training or education. (Doc. 222 ¶ 23; Doc. 232 ¶ 23.)  Instead, they only required dancers to have a license from

---

[1] Bones Cabaret is the trade name of Freedom of Expression LLC. (Doc. 6 ¶ 14.) Skin Cabaret is the trade name of Wisnowski Incorporated (*Id.*) Each entity is owned by Todd Borowsky (*Id.* ¶ 15.) When this Order refers to "Defendants," it is referring to Freedom of Expression LLC, Wisnowski Incorporated, and Todd Borowsky.

[2] The foregoing analysis addresses the cross motions for summary judgment. Defendants' Motion to Strike is denied because Rule 12(f) of the Federal Rules of Civil Procedure only applies to pleadings. Fed. R. Civ. P. 7(a). With there being no other basis to support Defendants' Motion to Strike, it is not authorized under Local Rule of Civil Procedure 7.2(m)(1). Plaintiffs' Motion to Strike is denied because Defendants' Revised Motion for Summary Judgment complied with the Court's Scheduling Order by combining the statement of facts with its substantive argument.

the City of Scottsdale and the "physical characteristics and dancing skills to entertain customers of the clubs." (Doc. 222 ¶ 22; Doc. 222-12 at 3:3-6; Doc. 232 ¶ 22.) Plaintiffs demonstrated that they met those requirements by doing an onstage audition in front of a manager. (*See* Doc. 232-8 ¶¶ 4-5.)

After their audition, Defendants' representatives took Plaintiffs on a tour of the clubs and had them sign a "Performer Lease Agreement." (*Id.* at ¶¶ 5, 7.) The agreement stated Plaintiffs and Defendants "intend[ed] to create a lessor-lessee relationship" with one another and that each party expressly acknowledged the status created from the agreement was "that of a lease for use of the premises." (Doc. 232-2 ¶¶ 1-2.) The Performer Lease Agreement did not have a set contract length. (Doc. 222 ¶ 24, Doc. 232 ¶ 24.) Nor did it prevent Plaintiffs from performing at competing clubs. (Doc. 230 ¶ 9, Doc. 230-3 ¶¶ 11-12.)

Once hired, Plaintiffs had to abide by several "house rules." (Doc. 232-3 ¶ 21.) They included a general "restriction[] on illegal, criminal, and untoward behavior," as well as more specific rules concerning the day-to-day operations of the clubs. (*Id.*) For example, Plaintiffs had to sign-in when they entered the club and pay a "house fee" before they began working. (Doc. 222-12 at 4:5-6; Doc. 232-5 ¶ 8.) The house fee ranged from $0 to $40 depending on Plaintiffs' shift. (Doc. 232-4 at 16:10-13.) While working, Plaintiffs had to ensure their performances "were within the bounds of decency under the law and that [Plaintiffs'] conduct would not expose Defendants to criminal or civil liability or otherwise interfere with the clubs' normal operations." (Doc. 232-3 ¶ 20.) At the end of their shift, Plaintiffs had to sign a document "affirming that each of them received tips in excess of the prevailing minimum wage." (*Id.* ¶ 10.) That document specifically noted Plaintiffs were performing at Defendants' clubs as independent contractors. (Doc. 230 ¶ 4; Doc. 230-3 Ex. A.) Failure to follow any of the "house rules" could result in fines or termination. (Doc. 232-3 ¶ 21.)

Plaintiffs were compensated through tips from customers and revenues from private shows. (Doc. 222 ¶ 5; Doc. 232 ¶¶ 5, 6.) At no point did Defendants pay Plaintiffs a salary

or hourly wage. (Doc. 222 ¶ 5; Doc. 230 ¶ 7.) For tips, Defendants set the price for customers to enter their clubs and the "guideline values" Plaintiffs charged for services. (Doc. 222-9 at 5-6:25-2.) Defendants kept a percentage of any tips received by Plaintiffs, and Plaintiffs took home the remaining amount in cash. (Doc. 232-4 at 6:15-17.) For private shows, Defendants negotiated "[t]he amount charged for any private dances or performances" and gave Plaintiffs the opportunity to perform at the scheduled shows. (Doc. 222-12 at 3:24-27.) Those Plaintiffs who agreed to perform at the shows received a percentage of the contract price and any additional tips paid by the customer. (*Id.* at 3-4:27-1.) Payment of the contract percentage came to Plaintiffs via a check from Defendants. (Doc. 232-4 at 10:21-26.)

## II.   LEGAL STANDARD

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citations omitted); *see also Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994) (holding that the court determines whether there is a genuine issue for trial but does not weigh the evidence or determine the truth of matters asserted).

Where, as here, the "parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cnty. Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations and internal quotations omitted). The summary judgment standard operates differently depending on whether the moving or non-moving party has the burden of proof. *See Celotex Corp. v. Catrett*,

477 U.S. 317, 322-23 (1986). When the movant bears the burden of proof on a claim at trial, the movant "must establish beyond controversy every essential element" of the claim based on the undisputed material facts to be entitled to summary judgment. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (citation omitted). If the movant fails to make this showing, summary judgment is inappropriate, even if the non-moving party has not introduced contradictory evidence in response. When, on the other hand, the non-movant bears the burden of proof on a claim at trial, the movant may prevail either by citing evidence negating an essential element of the non-movant's claim or by showing that the non-movant's proffered evidence is insufficient to establish an essential element of the non-movant's claim. *See Celotex*, 477 U.S. at 322-23; 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2727.1 (4th ed. 2022).

### III. DISCUSSION

#### A. Collateral Estoppel

Plaintiffs argue the Court can resolve both summary judgment motions by finding "Defendants are estopped from relitigating that its dancers were properly classified as independent contractors since they lost on this issue in arbitration." (Doc. 222 at 9.) Plaintiffs present a document titled "Ruling on Claimant's Partial Motion for Summary Judgment" to support their argument. (Doc. 222-13.) That document is an arbitration decision between Defendants and a former Plaintiff in this suit. (Doc. 17.) The decision finds that the former Plaintiff was an employee of Defendants. (Doc. 222-13 at 3-4.)

Defendants respond that the arbitration between themselves and the former Plaintiff has not concluded. (Doc. 232 at 15.) They also note the arbitration decision was based on a technical admission, which Defendants claim cannot be used against them in another proceeding. (*Id.* at 16.)

The burden of proving offensive nonmutual issue preclusion rests with the moving party. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1050-51 (9th Cir. 2008); *see also Appling v. State Farm Mut. Auto. Ins.*, 340 F.3d 769, 775 (9th Cir. 2003) ("District courts have discretion whether to apply offensive non-mutual collateral estoppel, and we may

only reverse if they have abused that discretion."). Plaintiffs do not present any evidence that the arbitration decision resulted in a final award, or that any award was subsequently approved by a state or federal court. Without such evidence, the arbitration decision is presumably unreviewed and does not have preclusive effect in a federal court action. *Caldeira v. County of Kauai*, 866 F.2d 1175, 1178 (9th Cir. 1989). Furthermore, Plaintiffs' contention that this motion acts as a review of the arbitration decision is incorrect. (Doc. 236 at 7.) Confirmation of an arbitration decision requires a formal order. 9 U.S.C. § 9. The Court will deny summary judgment on this issue.

### B.     Procedural Deficiencies

Next, Defendants argue there are two procedural deficiencies in Plaintiffs' Motion for Partial Summary Judgment. Because the Court finds neither argument persuasive, it will only briefly address each.

The first supposed deficiency is "Plaintiffs' citation to and reliance on the unverified Answer filed by Defendants" to support basic background information about the case. (Doc. 222 ¶¶ 1-3, ¶¶ 7-12; Doc. 232 ¶ 1.) An unverified complaint cannot be used as evidence for summary judgment. *See Moran v. Selig*, 447 F.3d 748, 759 n.16 (9th Cir. 2006). But "admissions in the pleadings are generally binding on the parties," unless they "explain[] the error in a subsequent pleading or amendment." *Am. Title Ins. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988); *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859-60 (9th Cir. 1995). Defendants do not claim that their Answer contains any errors or requires amending. As such, Plaintiffs can rely on the formal admissions Defendants made in their Answer to support factual assertions. *See Am. Title Ins.*, 861 F.2d at 226.

The second supposed deficiency is "Plaintiffs seek[] to use statements made in the thirteen (13) Declarations attached as Exhibits 13-25 . . . as support for all twenty-two (22) Plaintiffs' claims." (Doc. 232 ¶ 4.) Defendants' argument attempts to limit the scope of summary judgment to only those Plaintiffs who have provided a declaration. (*See id.*)

The Court granted conditional class certification on September 30, 2022. (Doc. 55.) Defendants do not allege the non-declaring Plaintiffs are outside the scope of the certified

class. Nor do they allege that the non-declaring Plaintiffs were treated differently during their employment. In fact, Defendants' Revised Motion for Summary Judgment specifically asks the Court to find Plaintiffs were independent contractors because of their similar employment conditions. (*See generally* Doc. 230.) Therefore, Plaintiffs can rely on the thirteen declarations to support the claims of all twenty-two Plaintiffs.

### C.      Employer/Employee Relationship

Plaintiffs must prove three elements to establish a minimum wage violation under the FLSA: (1) Defendants were covered under the FLSA; (2) Plaintiffs were Defendants' employees; and (3) Plaintiffs were paid below the minimum wage. *See Leyva v. Avila*, 634 F. Supp. 3d 670, 675 (D. Ariz. 2022); 29 U.S.C. § 206(a). The cross motions at issue here concern the second element. Plaintiffs argue the material facts undisputably show they were employees. (Doc. 222 at 17.) Defendants argue the facts show Plaintiffs were independent contractors. (Doc. 232 at 14.)

Deciding between the two arguments requires examining the "economic realities" of Plaintiffs' relationship with Defendants. *Goldberg v. Whitaker House Coop.,* 366 U.S. 28, 32 (1961). Six factors help illuminate this inquiry: (1) "the degree of the alleged employer's right to control the manner in which the work is to be performed"; (2) "the alleged employee's opportunity for profit or loss depending upon his managerial skill"; (3) "the alleged employee's investment in equipment or materials required for his task, or his employment of helpers"; (4) "whether the service rendered requires a special skill"; (5) "the degree of permanence of the working relationship"; and (6) "whether the service rendered is an integral part of the alleged employer's business." *Real v. Driscoll Strawberry Assocs.*, 603 F.2d 748, 754 (9th Cir. 1979). No single factor is dispositive in deciding whether the economic realities create an employee-employer relationship. *Id.* Similarly, while "subjective intent" and "contractual labels" may be helpful in swaying the analysis, they are not conclusive and "cannot override the economic realities reflected in the factors described above." *Id.* at 755.

### 1. Degree of Control

The first *Driscoll* factor is "the degree of the alleged employer's right to control the manner in which the work is to be performed." *Id.* at 754. Indicators of control include "things like uniform requirements, general rules on workplace conduct, control over who c[an] enter the building, and control over customers of a business." *Gilbo v. Agment, LLC*, 831 Fed. Appx. 772, 777 (6th Cir. 2020).

Plaintiffs argue Defendants imposed oppressive and controlling policies on them, demonstrating their employment relationship. (Doc. 222 at 12-13.) To support their argument, they point to documents titled "Skin Cabaret House Rules." (*Id.*; Doc. 222-3.) Those documents outline comprehensive rules for workplace conduct, including dancers "must wear outfits that complement [their] body type and are in good condition," "must have [m]anager approval to end their shift early or leave before closing," and "may only work the specific shifts they were hired for." (Doc. 222-3 at 1-2.) The documents also restrict how dancers perform certain services for clients. (*Id.*) To demonstrate that Bones Cabaret implemented similar rules, Plaintiffs provide declarations explaining similar restrictions. (*See, e.g.*, Doc. 222-15 ¶ 7.) Plaintiffs believe the "Skin Cabaret House Rules" demonstrate enough control to find an employer-employee relationship under the first *Driscoll* factor. (*See* Doc. 222 at 13.) Plaintiffs also attempt to demonstrate control by pointing to Defendants being able to hire and fire dancers, impose fines for violating club rules, and require dancers to sign-in at the beginning of their shift. (*See id.*)

In response, Defendants provide a declaration from one of their managers. It says the "Skin Cabaret House Rules" were "printed up by someone at Skin Cabaret, but . . . no one ever enforced any of those rules on any of the dancers." (Doc. 232-5 ¶ 7.) The declaration continues by saying no similar rules were posted or enforced at Bones Cabaret. (*Id.* ¶ 5.) Defendants argue the manager declaration demonstrates that they did not promulgate the "Skin Cabaret House Rules" and did not enforce any rules beyond what was required by local ordinances and state law. (Doc. 232 ¶¶ 13-15.) In addition,

Defendants argue they did not exercise control over Plaintiffs because Plaintiffs could choreograph their own performances and choose their own costumes. (*Id.*; Doc. 230 at 7.)

Control can be shown through the mere existence of a rule. *See Harris v. Diamond Dolls of Nev., LLC*, 521 F. Supp. 3d 1016, 1023 (D. Nev. 2021); *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 242 (4th Cir. 2016). A promulgated rule creates a system where the threat of enforcement rests solely with the alleged employer and the risk of consequences rests solely with the alleged employee. *See Hart v. Rick's Cabaret Int'l., Inc.*, 967 F. Supp. 2d 901, 918 (S.D.N.Y. 2013). An alleged employer exercises control through a promulgated rule by placing an inherent pressure on the alleged employee to conform their conduct with the rule or else risk the possibility of punishment. *See id.* That inherent pressure remains regardless of the amount of enforcement pursued by the alleged employer. *See id.* Thus, the foremost question is whether Defendants promulgated the "Skin Cabaret House Rules."

Both sides present competing evidence on whether Defendants promulgated the "Skin Cabaret House Rules." Plaintiffs claim they did, presenting the documents themselves and several declarations as proof. (Doc. 222-3; Doc. 222-15 ¶ 7.) Defendants claim they did not, offering a declaration that says "someone" printed the rules but otherwise being unclear on who that "someone" was. (Doc. 232-5 ¶ 7.) Deciding which side to believe will determine who prevails under the first *Driscoll* factor.

If Defendants promulgated the "Skin Cabaret House Rules," their conduct would mirror that of the club sued in *Harris*, 521 F. Supp. 3d at 1023. In that case, dancers also brought a minimum wage claim under the FLSA and sought to prove control by presenting evidence that dancers had to receive manager approval to leave early, satisfy certain appearance standards to perform, and follow the work schedules set by the club. *Id.* at 1019-20, 1023. The court held those rules "exerted a large degree of control over the dancers" and weighed the first *Driscoll* factor in favor of an employment relationship. *Id.* at 1023.

If, however, Defendants did not promulgate the "Skin Cabaret House Rules," the remaining evidence would weigh in favor of classifying Plaintiffs as independent contractors. The remaining evidence is Defendants imposed "house rules" that followed local ordinances and state law, such as requiring dancers to sign-in at the beginning of their shift. (Doc. 232 ¶¶ 13-15; Doc. 232-5 ¶ 8.) Dancers who did not follow those rules could be fired or fined. (Doc. 222 ¶¶ 13-15; Doc. 222-3; Doc. 232-3 ¶ 21.) Standing alone, those restrictions evidence a minimal amount of control. Any business employing an independent contractor would expect "to exert some control . . . over the performance of the contractor's duties and over his conduct on the company's premises." *McFeely*, 825 F.3d at 242. After all, to say that a business exercises control anytime it asks a contractor to follow the law would essentially require them to say "[d]o whatever you want, wherever you want, and however you please" to avoid potential liability. *Id.* That outcome would be unsustainable and would completely deprive employers of their business autonomy.

The outcome of this factor depends on whether a reasonable factfinder believes Defendants did or did not promulgate the "Skin Cabaret House Rules." Both sides present competing evidence on that point. Therefore, a genuine issue of material fact exists under the first *Driscoll* factor.

### 2. Opportunity for Profit or Loss

The second *Driscoll* factor is "the alleged employee's opportunity for profit or loss depending upon his managerial skill." 603 F.2d at 754. This factor asks if the alleged employee is "economically dependent on the business" or whether "he is 'in business for himself' and hence an independent contractor." *McFeeley*, 825 F.3d at 243 (citation omitted). Examination should consider what influence the alleged employee has over advertising, price setting, hours, and location. *See Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1371 (9th Cir. 1981).

#### i. Price Setting

Plaintiffs argue that Defendants maintained complete control over their ability to earn money. (Doc. 222 at 5.) They explain, Defendants controlled the customer volume

entering their clubs and the price of services charged by each dancer. (*Id.* at 14.) To support their argument, Plaintiffs again reference the "Skin Cabaret House Rules," which includes a restriction on overcharging and says anyone caught overcharging will face "suspension or termination [at] the manager's discretion." (Doc. 222-3 at 2.) Plaintiffs also provide declarations that say dancers had to "charge customers for dances at the prices set by the club," and dancers "had no authority to negotiate with customers or charge them higher prices." (*See e.g.*, Doc. 222-14 ¶ 7.)

Relevant evidence not cited by either party includes Defendants' response to an interrogatory question served by Plaintiffs. Defendants responded to the interrogatory by saying they inform "patrons of prices . . . including, as a basic example, what a patron needs to pay to enter the Venue."[3] (Doc. 222-9 at 5:22-23.) And that "if the guideline value of an air dance is $20 . . . then this Defendant would expect that the entertainer will collect at least $20 from the patron for the services provided." (*Id.* at 5-6:25-1.) Defendants, however, followed-up their interrogatory response by saying dancers "may demand (and receive) more or accept less than that amount." (*Id.* at 6:1-2.) Defendants also later amended their response to say that they negotiate the prices for private dances and performances with customers, and dancers would be paid an agreed-upon percentage of the contract price. (Doc. 222-12 at 3:24-27.) Despite these concessions, Defendants argue that they did not set prices because dancers were free to perform at other clubs and could perform online without any limitation or consequence. (Doc. 230 at 10; Doc. 232 at 14.)

The second *Driscoll* factor focuses on the relationship between the alleged employer and the alleged employee. *See McFeeley*, 825 F.3d at 243. Defendants attempt to stray the Court's focus by arguing Plaintiffs *could* have performed at other clubs and online. (Doc. 230 at 10; Doc. 232 at 14.) Even if Plaintiffs did do those things, they still could have been economically dependent on Defendants' business while working at their clubs. *See*

---

[3] Plaintiffs attached Documents 222-9 and 222-12 to their motion for summary judgment as evidence of Defendants' hiring practices and corporate structure. (Doc. 222-9 at 7; Doc. 222-12 at 2-3.) The Court, however, also finds them relevant in determining whether Defendants set prices. Fed. R. Civ. P. 56(c)(2) ("The court . . . may consider other materials in the record.").

- 10 -

*McFeeley*, 825 F.3d at 243. The Court, therefore, finds Defendants' argument unpersuasive.

The undisputed evidence is Defendants set the price for entering their clubs, the "guideline values" dancers should charge for services, and the amount charged for private dances. (Doc. 222-9 at 5-6:25-2; Doc. 222-12 at 3:24-27.) While this evidence undoubtedly shows Defendants had some involvement in setting prices, it does not definitively prove Plaintiffs were economically dependent to the degree of becoming employees. For example, Defendants admit they set "guideline values" for services, but they also state dancers "may demand (and receive) more or accept less than that amount." (Doc. 222-9 at 5-6:25-1.) That subsequent statement seems to suggest Plaintiffs maintain some degree of control over their profits. In addition, Defendants admit they negotiate the price of private dances and performances, but Defendants also state dancers could accept or deny the performances and would be paid an "agreed-upon percentage of the contract price." (Doc. 222-12 at 3:24-27.) The discretion to accept or deny performances is indicative of an independent contractor. And the ability to negotiate a percentage of the contract price gives the dancers some ability to generate their own profits. Thus, on balance, the undisputed facts are too ambiguous in their application to definitively favor one side over the other.

That leaves the undisputed fact Defendants set the price for customers to enter their clubs. Controlling the stream of clientele can affect a dancer's ability to earn a profit. But standing alone it is not so determinative to warrant summary judgment. *See McFeeley*, 825 F.3d at 243. A reasonable factfinder could conclude that Plaintiffs were not economically dependent on Defendants because of the discretion given to them after clients entered the clubs.

###       ii.      Hours

Plaintiffs next argue that Defendants had ultimate control over their schedules and ability to work. (Doc. 222 ¶ 15.) They support their assertion with a portion of the "Skin Cabaret House Rules" that says dancers "may only work the specific shift they were hired

- 11 -

for" and cannot move to a different shift without manager approval. (Doc. 222-3 at 2.) Plaintiffs' declarations also state dancers could only work shifts they were authorized to work; "for instance, a day shift dancer had to work day shifts." (Doc. 222- 14 ¶ 7.)

Defendants provide a declaration that states dancers "set their own work schedules, choosing if, when, and how long to dance." (Doc. 230-3 ¶ 17.) Defendants also note that Plaintiffs provided conflicting answers when responding to their written deposition questions. (Doc. 232 ¶ 28.) When asked, "[a]re you claiming that any of the Defendants required you to perform at specific times on specific days," some Plaintiffs responded that they made their own schedule and were "not required to work certain shifts or certain days." (Doc. 230-4 at 4:20-21.) While others responded "yes" to the question. (*Id.* at 10:23.) Defendants argue those responses contradict the declarations provided by Plaintiffs. (Doc. 232 ¶ 28.)

There is no undisputed evidence concerning Defendants involvement in setting hours for dancers. The weight given to Plaintiffs' differing answers to the written deposition questions is best left for a jury. So too is deciding whether to believe the competing declarations provided between Plaintiffs and Defendants.

### iii. Advertising and location

Plaintiffs finally argue that Defendants managed "drawing customers to the club through marketing, promotional, and advertising efforts." (Doc. 222 at 14.) Their argument alleges Defendants advertised the club and "decide[d] the image to portray in order to attract certain customers." (*Id.*) Plaintiffs offer Defendants' websites as evidence. (*Id.*)

Defendants object to the use of their websites as evidence. (Doc. 232 ¶ 27.) They claim the websites are inadmissible hearsay and lack foundation. (*Id.*). Defendants, however, do not otherwise dispute that they handle marketing, promotional, and advertising for their clubs. (*See id.* ¶¶ 26-27.)

Without addressing the merits of either Parties' argument, two of the three considerations are in dispute or otherwise too ambiguous to favor one side over the other. As such, there is a genuine issue of material fact under the second *Driscoll* factor regardless

of how the advertising and location consideration pans out.

### 3. Investment

The third *Driscoll* factor is "the alleged employee's investment in equipment or materials required for his task, or his employment of helpers." 603 F.2d at 754. This factor considers the alleged employee's "total investment in the company to 'the company's total investment, including office rental space, advertising, software, phone systems, or insurance,' and 'is most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered.'" *Gilbo*, 831 Fed. Appx. at 776 (quoting *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 810 (6th Cir. 2015)).

Defendants concede their financial investment in the business is objectively greater than Plaintiffs'. (Doc. 222-5; Doc. 232 ¶ 21.) Yet Defendants argue in their motion for summary judgment that Plaintiffs' investment in their costumes and makeup warrant finding they were independent contractors. (Doc. 230 at 10-11.) Even assuming Plaintiffs spent thousands of dollars on costumes and makeup to perform at Defendants' clubs, that amount would still presumably be less than what Defendants spend on advertising, facilities, and maintenance. *See e.g.*, *Harrell v. Diamond A Ent.*, 992 F. Supp. 1343, 1350 (M.D. Fla. 1997) (finding a dancer who spent a $1,000 on costumes, $130 a month for hairstyling, $100 a month for make-up, and $65 a month for shoes had only a minor investment compared to the club's operators). The Court, therefore, finds Defendants' argument unpersuasive. Defendants' concession in their Revised Response to Plaintiffs' Motion for Partial Summary Judgment requires finding there is no genuine issue of material fact under the third *Driscoll* factor.

### 4. Degree of Skill

The fourth *Driscoll* factor is "whether the service rendered requires a special skill." 603 F.2d at 754. Relevant considerations under this factor include "the complexity of the work performed, how the worker acquired their skill, and the length of the worker's training period." *Gilbo*, 831 Fed. Appx. at 776.

Plaintiffs provide evidence of Defendants' hiring practices to argue the fourth *Driscoll* factor favors finding an employment relationship. (Doc. 222 at 15.) Specifically, Plaintiffs provide declarations that say Defendants did not require dancers to have any formal training, education, or dance experience. (*See, e.g.*, Doc. 222-14 ¶ 4.) Plaintiffs also point to Defendants' response to one of their interrogatory questions: "Please state the requirements to become a dancer at your business." (Doc. 222-12 at 2:14-15.) Part of Defendants' response was "[i]ndividuals seeking to perform at Defendants' clubs are asked to briefly audition to show that they have adequate dancing skills and physical attributes that give them the ability to entertain customers." (*Id.* at 2:24-26.)

Defendants produce a declaration from another manager that says "[i]ndividuals seeking to work at Skin Cabaret as dancers are asked to do an onstage audition consisting of two songs." (Doc. 232-8 ¶ 4.) The declaration continues, "if the audition is satisfactory, [the manager] takes the applicant on a tour of the club." (*Id.* ¶ 5.) Defendants argue this declaration indicates that being an exotic dancer requires significant skill. (Doc. 230 ¶¶ 22-23.)

The undisputed evidence is dancers did not need any formal training, education, or work experience to perform at Defendants' clubs. (*Id.*) Defendants try to create an issue of material fact by claiming that an exotic dancer needs a high degree of skill to be successful. (Doc. 230 at 11.) Defendants, however, fail to present any evidence to support their point. Their manager declaration only indicates that an audition must be "satisfactory" for an applicant to gain employment at Defendants' clubs. (Doc. 232-8 ¶ 5.) And their interrogatory response defines the requisite level of dancing skills as "the ability to entertain customers." (Doc. 222-12 at 2:24-26.) Even assuming that standard encompasses some degree of skill, it is minimal and favors classifying Plaintiffs as employees. *See McFeeley*, 825 F.3d at 244 ("Moreover, even the skills displayed by the most accomplished dancers in a ballet company would hardly by itself be sufficient to denote an independent contractor designation.").

Alternatively, Defendants try creating an issue of material fact by saying exotic dancers benefit from their personal initiative. (Doc. 230 at 12.) But again, Defendants fail to provide any evidence that demonstrates the initiative of their dancers goes beyond the minimal skill of hustling for tips. *See Harrell*, 992 F. Supp. 1350-51.

Accordingly, there is no genuine issue of material fact under the fourth *Driscoll* factor.

### 5. Permanency of the Relationship

The fifth *Driscoll* factor is "the degree of permanence of the working relationship." 603 F.2d at 754. This factor is normally given little weight within the context of exotic dancing due to the transitory nature of the work. *McFeeley*, 825 F.3d at 244.

Here, the undisputed evidence is Plaintiffs did not have set contract lengths and worked for Defendants for varying periods of time. (Doc. 222-14 ¶ 2; Doc 230-2; Doc. 232 ¶¶ 24-25.) A reasonable fact finder could conclude the absence of an end date in the Performer Lease Agreement shows an intent to create an employment relationship. *Donovan*, 656 F.2d at 1372 ("[T]rue independent contractors have a fixed employment period."). Yet a reasonable fact finder could also conclude the varying periods of employment (some as short as two months) coupled with the ability to work at competing clubs indicates Plaintiffs were independent contractors. *See id.* (finding the fifth *Driscoll* factor favored an employment relationship because the alleged employees worked "for long periods of time" with the alleged employer).

Thus, there is a genuine dispute of material fact under the fifth *Driscoll* factor.

### 6. Integral to the Business

The final *Driscoll* factor is "whether the service rendered is an integral part of the alleged employer's business." 603 F.2d at 754. Under this factor, "the more integral the worker's services are to the business . . . the more likely it is that the parties have an employer-employee relationship." *Acosta v. Off Duty Police Servs. Inc.*, 915 F.3d 1050, 1055 (6th Cir. 2019).

Plaintiffs offer declarations that state Defendants' clubs could not operate without dancers. (*See e.g.*, Doc. 222-14 ¶ 6.) They note Defendants advertise themselves as a strip club, indicating dancers are the "product" Defendants sell to customers. (Doc. 222 at 17.)

Defendants argue Plaintiffs' declarations constitute legal conclusions that lack foundation. (Doc. 232 ¶¶ 26-27.) Defendants do not, however, otherwise provide evidence to contradict Plaintiffs' assertions. (Doc. 230 at 13-14.)

The opinion reached in Plaintiffs' declaration was Defendants "would not be able to operate if they did not have dancers." (Doc. 222-14 ¶ 6.) The basis for that opinion was the declarants' personal experience that "dancers are the primary reason why customers go to [their clubs]." (*Id.*) That is not a legal conclusion and has sufficient foundation. Moreover, the opinion reached by Plaintiffs is within the scope of Rule 701 of the Federal Rules of Civil Procedure. *Range Rd. Music, Inc. v. E. Coast Foods, Inc.*, 668 F.3d 1148, 1153 (9th Cir. 2012) (noting that lay testimony derives from reasoning common in everyday life.) As admissible evidence, and considering Defendants do not offer anything to dispute the declarations, there is no genuine dispute of material fact under the final *Driscoll* factor.

### 7. Consideration of all the Factors

In sum, three factors favor an employment relationship while three present a genuine issue of material fact. Because no single factor is dispositive, and the remaining disputed factors could sway the analysis in either direction, summary judgment is inappropriate for either party. *Driscoll Strawberry Assocs.,* 603 F.2d at 754; *see also Narayan v. EGL, Inc.*, 616 F.3d 895, 901 (9th Cir. 2010) ("Judge Easterbrook has keenly observed in a case under the Fair Labor Standards Act that if we are to have multiple factors, we should also have a trial.") (citation omitted).

Defendants argue the Performer Lease Agreement requires finding Plaintiffs were independent contractors. (Doc. 230 at 6-7.) While "subjective intent" and "contractual labels" may be helpful in swaying the analysis, they are not conclusive and "cannot override the economic realities reflected in the [*Driscoll*] factors." *Driscoll Strawberry*

*Assocs.*, 603 F.2d at 754. There remains a genuine issue of material fact on three factors, and the other three weight in favor of an employment relationship. The Court rejects Defendants' argument as trying to make the Performer Lease Agreement conclusive—an outcome specifically forsworn in *Driscoll*.

## IV. CONCLUSION

Therefore,

**IT IS ORDERED** Plaintiffs' Motion for Partial Summary Judgment on Liability (Doc. 222) is **DENIED.**

**IT IS FURTHER ORDERED** Plaintiffs' Motion to Strike (Doc. 228) is **DENIED**.

**IT IS FURTHER ORDERED** Defendants' Revised Motion for Summary Judgment (Doc. 230) is **DENIED**.

**IT IS FINALLY ORDERED** Defendants' Motion to Strike (Doc. 232) is **DENIED**.

Dated this 9th day of October, 2024.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge